# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF FLORIDA
### TALLAHASSEE DIVISION

| | |
|---|---|
| ELIZABETH META FREDERICK as Personal Representative of the Estate Jennifer Casey Norred, and on behalf of the Survivors, Elizabeth Frederick, mother, and William James Norred, father. | CASE NO. 4:19-cv-162-MW-CAS |
|      Plaintiffs, | |
| v. | |
| HON. WALTER McNEIL, as Sheriff of Leon County, Florida, and CORIZON, LLC, a Health Services Corporation, and MARIA LILIANA GARCIA, M.D., KIMBERLY PETERSEN, DEBBIE SELLERS, and MISTY ROBERTSON, in their individual capacity, | |
|      Defendants. | |

## AMENDED COMPLAINT FOR DAMAGES

### Introduction

On July 24, 2017, Jennifer Casey Norred, a young woman suffering mental illness and doing relatively well on community supervision, received charges relating to her mental illness and was held in the Leon County Jail pending resolution. After months without significant mental health treatment, and after a degrading prolonged session in a restraint chair, tied her jail-issued uniform pants to her bunk and around her neck and hung herself. By the time jail staff checked on her and managed to remove the ligature, she was unresponsive and did not survive. Accordingly, her Personal Representative now files this action and alleges:

## Jurisdiction and Venue

1. Plaintiff's claim for relief is based on 42 U.S.C. § 1983 and state law claims. This Court has jurisdiction under 28 U.S.C. §§ 1331 and 1343.

2. Plaintiff further invokes the supplemental jurisdiction of this Court, pursuant to 28 U.S.C. § 1367, to consider the state law claims alleged herein.

3. Plaintiff's claim is also based on Title II of the Americans with Disabilities Act, 42 U.S.C. § 12131, and 12133, and § 504 of the Rehabilitation Act.

4. Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) and § 1391(c), as the events sued upon occurred in this judicial district.

5. Plaintiff has provided timely notice under § 768.28 and received no response.

6. All conditions precedent to this action have been performed or waived.

## Parties

7. ELIZABETH META FREDERICK, mother of Jennifer Casey Norred, is Personal Representative of the Estate of Jennifer Casey Norred, and sues for the Estate and survivors, Elizabeth Meta Frederick and William James Norred.

8. At all times material hereto, WALTER McNEIL, or his predecessor, was Sheriff of Leon County, the constitutional officer who operates the Leon County Detention Center ("Jail") and is sued in his official capacity.

9. At all times material hereto, CORIZON LLC was a health services corporation, responsible for providing medical care to Jail prisoners.

10. At times material hereto KIMBERLY PETERSEN was the Jail Administrator. She is sued in her individual capacity.

11. At all times material hereto, MARIA LILIANA GARCIA, M.D., was the physician at the Jail and is sued in her individual capacity.

12. At all times material hereto, DEBBIE SELLERS was Health Care Administrator at the Jail and is sued in her individual capacity.

13. At all times material hereto, MISTY ROBERTSON, was the Jail mental health counselor for Casey Norred, and is sued in her individual capacity.

14. All the above Defendants were all acting under color of law.

## Common Allegations of Fact

15. On April 2, 2017, Jennifer Casey Norred was booked at the Leon County Jail.

16. At the time of her arrest, Ms. Norred was living independently in the community with the help of a treatment team and doing relatively well.

17. She was arrested for "stalking" shortly before her next scheduled check-up.

18. Casey Norred had just turned 35 and would spend her 36th birthday in the Jail on April 28, 2017. She suffered from several chronic conditions, including hypothyroidism, schizophrenia, bipolar disorder, and depression.

19. Although initially Ms. Norred self-reported no mental health problems, Jail records showed a history of concerns for self-harm and at least one prior suicide attempt was clearly documented in the Jail records.

20. On April 5, there is a chronological note in her health records that Casey Norred was resistant to mental health care medication or services.

21. Her earlier appointment with the jail psychiatrist was not rescheduled.

22. Mental health care was terminated by the counselor despite Ms. Norred's "guarded and irritable with pressured speech" – symptoms indicative of an early exacerbation of Schizoaffective disorder.

23. Jail staff were aware of Ms. Norred's treatment with Apalachee Center in Tallahassee and requested her records but there is no indication they were ever reviewed and no one contacted Apalachee regarding her care.

24. There is no indication in the health care records that Ms. Norred received any kind of work-up for mental health medications or therapy at the Jail.

25. There was only one attempted contact by Jail mental health staff between the mental health screening in April and her first suicide attempt in July.

26. On June 5, 2017, a file note suggested Ms. Norred be re-evaluated as a "special needs" inmate but a responsive not stated, "According to the Mental Health Professionals, she does not qualify for special needs."

27. Throughout June, Ms. Norred's behavior grew increasingly erratic but there were no documented efforts to re-engage her in mental health care.

28. The court found Ms. Norred incompetent to proceed based on a court-ordered mental health evaluation on June 15, 2017, which found as follows:

available evidence strongly suggests [JN] is presently hostile, agitated, irrational and obsessed with contacting the victim. All of these signs are consistent with her history and reflect an episode of psychiatric decompensation. Thus JN is in need of inpatient psychiatric treatment and should be turned over to the Florida Department of Children and Families (DCF) for psychiatric stabilization and treatment.

29.    Section 916.107(1)(a) Florida Statutes provides:

In a criminal case involving a client who has been adjudicated incompetent to proceed or not guilty by reason of insanity, a jail may be used as an emergency facility for up to 15 days following the date the department or agency receives a completed copy of the court commitment order containing all documentation required by the applicable Florida Rules of Criminal Procedure. For a forensic client who is held in a jail awaiting admission to a facility of the department or agency, evaluation and treatment or training may be provided in the jail by the local community mental health provider for mental health services, by the developmental disabilities program for persons with intellectual disability or autism, the client's physician or psychologist, or any other appropriate program until the client is transferred to a civil or forensic facility.

30.    There is no indication in the health care records that Ms. Norred received any further mental health examination or treatment until her July suicide attempt.

31.    On July 21, 2017, Ms. Norred made an unsuccessful attempt to hang herself.

32.    As a result, Ms. Norred was placed into a restraint chair for the next 24 hours.

33.    The use of restraint chairs is controversial and is not a substitute for nursing care or therapeutic intervention in a self-harm mental health emergency.

34.    Use of a restraint chair does not constitute mental health care.

35.    The restraint chair was mis-used by corrections and medical staff at the Jail.

36.    In this case, the use of a restraint chair merely relieved medical providers of

the need for a 24-hour direct observation, freeing up medical staff.

37. The Jail medical provider, Corizon, has a history of short-staffing medical personnel and minimizing care to reduce costs and maximize profits.

38. Casey Norred struggled to avoid being placed in the restraint chair.

39. Casey Norred was kept in the restraint chair 24 hours, from 10:47 a.m., on Friday, July 21, 2017, through 10:40 a.m. Saturday, July 22, 2017.

40. At about 11:27 a.m. on July 21, within just 40 minutes of being placed in the chair, it appeared from the notes that Casey Norred suffered a seizure.

41. While in the chair, Casey Norred cried and screamed until she was exhausted.

42. During approximately 24 hours in the restraint chair, Casey Norred was given only eight breaks, including only one restroom break at 9:40 Friday night.

43. Jail staff had to clean up urine from under and around the restraint chair.

44. Casey Norred wasn't given anything to eat until 3:00 Saturday morning.

45. Casey Norred was released from the restraint chair at 10:40 Saturday a.m.

46. The use of the restraint chair, used or perceived as punishment, with inadequate comfort breaks or food, was certain to cause humiliation, anger, and further self-harm, albeit by more covert means.

47. Casey Norred was then placed on Direct Observation in a paper gown.

48. After release from the chair, Casey Norred was directly observed by Misty Robertson, LMHC, CCHP, whose title is "Mental Health Clinician."

49. During the observation period, Casey Norred was observed sleeping or lying rolled up in her mattress since she wasn't allowed to have a blanket.

50. Casey Norred apparently refused her thyroid medication, Levothyroxine.

51. During the observation period, Casey Norred stated that she didn't really want to kill herself; she was just upset after receiving some bad news.

52. Casey Norred's "Mental Health Progress Note, notes she asks that her clothes be returned and the note indicates "moderate improvement," but not "stable."

53. While under direct observation, Ms. Norred was yelling in her cell and was quoted as saying, "Shoot me in the head" and "I'm a fucking ant."

54. Despite limited improvement and refusal to take her thyroid medication, Norred was released from Direct Observation and given a follow up mental health appointment in three days by counselor Misty Robertson.

55. There is no indication that Casey Norred received actual mental health care.

56. Officer Pleas was present with Defendant Robertson when Casey Norred requested to be removed from Direct Observation and given her clothes.

57. Pleas recalls Norred was taken off Direct Observation the same day.

58. Casey Norred was moved from Direct Observation area in Pod E-1 to confinement cell #19 in Pod M, after being cleared by Misty Robertson.

59. Sgt. Lacarra Brown escorted Casey Norred to M Pod on Monday, July 24, 2017, and recalls Casey Norred saying something about feeling better.

60. In M Pod, there were no suicide prevention measures taken and the cell in which Norred was placed offered numerous anchor points for a ligature.

61. At 10:00 a.m., Casey Norred was found by prison staff hanging in her cell, suspended from her bunk by her jail uniform pants, tied around her neck.

62. Any adequate suicide prevention protocols in the Jail were not followed.

63. Defendant Sellers as Jail Administrator endorsed the lax suicide prevention protocols as within policy and made no effort to discipline or retrain staff.

64. Officer Lacarra Brown and Sgt. Howard together attempted to hold Casey Norred up and untie the uniform, which efforts were unsuccessful.

65. Lieutenant Dennis Rathman responded to the cell with several officers who tried to release the ligature from Casey Norred's neck.

66. Officer Joseph McGrady could not untie the ligature and eventually lifted her up in a "bear-hug," while Medical Officer Jeffery Pleas untied the knot.

67. No one had or could find a ligature cutter or lacked training to access one.

68. By then, Casey Norred was unresponsive, without a pulse.

69. At that time, it is reported that CPR was started and EMS was called.

70. Officer McGrady stated he thought he heard a breath when he was holding her up, but thought it could have been a result of the way he was holding her.

71. Emergency Medical Services paramedics arrived at about 10:22 a.m. and at 10:24 a.m., Casey Norred was pronounced dead.

72. Casey Norred was a person who suffered a disability that prevented her from receiving the services, benefits, and programs at the Leon County Jail.

73. Sheriff McNeil, or his predecessor as Sheriff, had a duty to reasonably accommodate Casey Norred's disabilities to prevent the harm that befell her.

74. At all times material hereto, Sheriff McNeil, or his predecessor as Sheriff, and the Leon County Detention Center were recipients of federal funds.

75. At all times material hereto, Sheriff McNeil conducted regular audits and received reports on conditions at Leon County Detention Center.

76. The Defendant Sheriff was made aware that inmates, including Jennifer Casey Norred, were not receiving adequate mental health care at the Jail.

77. The Sheriff was made aware there was not sufficient mental health staff at the Jail to accommodate the needs of mental health patients at the Jail.

78. The Sheriff was made aware there was not sufficient trained security staff to accommodate the security needs of mentally ill inmates prone to self-harm.

79. There is a need for two separate but related protocols in a Jail to prevent self-harm by inmates: a security protocol and a mental health protocol.

80. The Leon County Jail was unconstitutionally deficient in both.

81. The Sheriff took part in medical contract and security budget planning that left mental health needs unmet for inmates like Jennifer Casey Norred.

82. There was no periodic review of restraint chair use.

83. The Sheriff was aware that Jail staff were inadequately supervised, trained and equipped to respond to self-harm episodes like hanging attempts.

84. Jail Administrator Kimberly Petersen was aware that there was not an adequate or meaningful security protocol for self-harm at the Jail.

85. Defendant Peterson was aware that there was not sufficient staffing, supervision, training, or equipment to effectively prevent self-harm.

86. Defendant Peterson was aware the restraint chair was used to make up for officer short-staffing and as punishment for inmate suicide attempts.

87. Defendant Peterson was aware that mental health contractors were not living up to their contract to provide treatment for mentally ill inmates at the Jail.

88. Defendant Peterson did not ensure that Security Officers had ligature cutters available for hanging incidents or knew how to access or use them.

89. Defendant Maria Garcia, M.D., was aware that Casey Norred was not receiving medication or treatment for her mental health care needs.

90. Defendant Garcia was aware that mental health staff was using the restraint chair to cover short-staffing and as punishment for self-harm ideations.

91. Defendant Garcia was aware that forcible restraint, inadequate breaks, and hostile treatment would breed anger that would result in further self-harm.

92. Defendant Garcia was aware the restraint chair was not medical treatment and had no protocol to review restraint chair use with mental health.

93. Defendant Garcia was aware that mental health staff's training was inadequate as were protocols for monitoring and assessing suicide risks.

94. Defendant Robertson was aware that use of the restraint chair to cover short-staffing and as punishment for self-harm ideations increased suicide risks.

95. Defendant Robertson was aware that forcible restraint, inadequate breaks, and hostile treatment breeds anger that results in further self-harm.

96. Defendant Robertson was aware the restraint chair is not medical treatment.

97. Defendant Robertson was aware that her training was inadequate to assess suicide risks and that she needed to acquire relevant skills but did not.

98. Casey Norred struggled with anxiety, depression, schizophrenia, and bipolar disorder and with intermittent, though fleeting, urges to take her own life.

99. For most of her years, Casey Norred held out a strong hope for a normal life.

100. But Casey Norred found little mental health support at the Leon County Jail.

101. A cost-saving policy of refusal to provide inmates with actual mental health treatment and therapy and an inappropriate reliance on measures to quiet and restrain rather than treat, left her without treatment at a critical period.

102. Casey Norred felt ignored and brutalized by Jail Staff and saw no way out.

103. On Monday, July 24, 2017, in desperation, Casey Norred took the only way she saw open to her. When no one was watching, she killed herself.

104. As a direct and proximate result of Defendants' wrongful acts and omissions,

decedent suffered pain and death in the Jail, ending on July 24, 2017.

105. Plaintiff has been obliged to retain counsel and is entitled to reasonable attorneys' fees pursuant to 42 USC §1988 as well as taxable costs.

## Causes of Action:

## I.      Claims under 42 U.S.C. 1983, Failure to Protect (McNeill)

106. Plaintiff re-alleges the Common Allegations of Fact as if fully set forth herein.

107. Plaintiff is entitled to relief against Defendant McNeil, as Sheriff, for policies leading to violation of the Fourteenth Amendment to the U.S. Constitution.

108. Jennifer Casey Norred had a Fourteenth Amendment right protection from self-harm by security, and to have treatment for her mental health issues.

109. Although the Sheriff had contracted with a health care company for medical and mental health treatment for prisoners, he had a non-delegable duty for the provision of those services through oversight of contract performance.

110. The Sheriff was made aware that his Jail contained a significant number of mentally-ill prisoners and prisoners who were at risk for self-harm.

111. The Sheriff was made aware of a need for mental health treatment, medical and security staffing, training, supervision and protocols for self-harm events.

112. The Sheriff had an inherently dangerous custom or practice of:

   a. short-staffing the Jail and making up for short-staffing by use of the restraint chair and other convenient shortcuts;

   b. allowing security officers to use the restraint chair as humiliation and

punishment for suicide attempts;

    c. Failing to require a mental health recommendation for use of the chair;

    d. using the restraint chair without adequate comfort breaks or food, in a way certain to trigger further self-harm;

    e. failing to require appropriate training or drills to quickly and effectively respond to inmate hanging attempts.

113. The Sheriff knew of a substantial risk that some inmates, left untreated, would attempt suicide, and that inmates at risk had means to accomplish that end.

114. The Sheriff was deliberately indifferent to the immediate and serious threat to risks of inmate suicide attempts as noted above.

115. As a direct result of the Sheriff's deliberate indifference, Jennifer Casey Norred suffered pain and death in the Leon County Detention Center.

116. Plaintiff is obliged to retain counsel and is entitled to reasonable fees.

WHEREFORE, Plaintiff prays for judgment as noted below.

## II. Claims under 42 U.S.C. 1983: Failure to Treat (Corizon)

117. Plaintiff re-alleges the Common Allegations by reference.

118. Plaintiff is entitled to relief against Defendant Corizon, based on customs or practices in violation of the Fourteenth Amendment to the U.S. Constitution.

119. Jennifer Casey Norred, had a right under the Fourteenth Amendment to the U.S. Constitution to receive care for a known serious health condition.

120. Defendant Corizon had customs or practices of deliberate indifference to the timely provision of needed care for serious medical and mental health

conditions to reduce costs and maximize profits.

121. Corizon had a custom or practice of indifference to serious psychological and mental health needs, by short-staffing medical provider positions and using resorts like restraint chairs to substitute for professional therapeutic care.

122. Corizon was made aware that there were inmates in the Jail who suffered from severe mental health needs and were at risk of self-harm, including suicide and, absent care and monitoring, had the means to accomplish that end.

123. Corizon exhibited deliberate indifference to prisoners' serious medical and psychological needs by denying and unreasonably delaying access to competent mental health care by its customs or practices, including:

   a. inadequate screening/evaluation at intake;

   b. failure to get or review information from outside treatment providers;

   c. failure to review inside information from prior stays;

   d. inadequate mental health examination;

   e. failure to have Ms. Norred seen by psychiatrist;

   f. failure to follow up self-reporting with review of prisoner health histories to take advantage of the work of prior health professionals;

   g. systemic limitations, denials, and delays in care motivated primarily by a desire to minimize costs and maximize profits;

   h. failing to implement needed suicide protocols aimed at prisoners with prior suicide attempts where suicide efforts were reasonably foreseeable;

   i. failing to monitor or observe prisoners on a regular basis where prisoners expressed thoughts of committing suicide and had made repeated efforts;

j. failing to provide potentially suicidal inmates with psychological work-ups and d psychiatric care, including inmates with self-harm histories;

k. tolerating mental health care that was so grossly inadequate as to fairly be characterized as no medical and mental health care at all.

124. In light of the aforementioned, Jennifer Casey Norred suffered from both an objectively and subjectively substantial risk of serious harm while under Corizon's care and Corizon reacted to this risk unreasonably.

125. It is more likely than not that Corizon's derelictions as alleged above were the cause of Casey Norred's death through suicide.

126. As a direct and proximate result of Corizon's deliberate indifference to Jennifer Casey Norred's serious mental health needs, Jennifer Casey Norred committed suicide by hanging herself in her cell on July 24, 2017.

127. Plaintiff is obliged to retain counsel and is entitled to reasonable fees.

WHEREFORE, Plaintiff prays for judgment as noted below.

## III. Fourteenth Amendment Violation: (Garcia, Sellers, Robertson)

128. Plaintiff re-alleges the Common Allegations by reference.

129. Plaintiff is entitled to relief against Defendants Maria Garcia, Debbie Sellers, and Misty Robertson under 42 U.S.C. § 1983, based on violation of the Fourteenth Amendment to the U.S. Constitution.

130. Defendants Garcia, Sellers, and Robertson became aware of a substantial risk Casey Norred would seriously attempt self-harm, that acts of self-harm were imminent, and that she possessed the means to accomplish that end.

131. As to Defendants Health Services Administrator Sellers and Dr. Garcia:

    a. approving jail treatment plans that had no medication or services;

    b. endorsing abusive practices by failing to discipline or retrain staff;

    c. approving the use of the restraint chair in Ms. Norred's situation.

132. As to Defendant Robertson, and also Dr. Garcia and HSA Sellers to the extent they were involved, they deliberately disregarded the immediate serious threat to Jennifer Casey Norred's mental health and well-being, exhibiting deliberate indifference to serious mental health needs, by:

    a. failing to reschedule Ms. Norred's appointment with the jail psychiatrist;

    b. denying or unreasonably delaying structured mental health care appropriate to Casey Norred's serious, urgent mental health needs;

    c. failing to order or perform diagnostic mental health work-ups to prescribe and administer mental health medication, treatment and therapy;

    d. denying or unreasonably delaying intensive, daily, prolonged and individually-tailored crisis stabilization therapies;

    e. in the absence of intensive and structured mental health care and treatment, failing to keep Casey Norred on close suicide watch;

    f. failing to transfer Ms. Norred to a higher level of care following a serious suicide attempt when found unconscious and unresponsive;

    g. failing to evaluate immediately after a serious suicide attempt;

    h. failing to provide any treatment following a serious suicide attempt;

    i. failing to provide empathetic response after a suicide attempt but placing in a restraint chair and then into an observation cell.

    j. failing to provide more than a superficial assessment three days after her serious suicide attempt;

k. failing to carefully review observation logs showing she was not stable;

l. failing to notify family of serious suicide attempt or corroborate JN's report that family conflict precipitated her 7/21/17 suicide attempt

m. failing to consult with psychiatrist or expedite transfer to hospital.

133. Given their knowledge of Casey Norred's self-harm efforts and delusional thinking, the failure of Defendants Garcia, Sellers, and Robertson to provide intensive psychiatric care by trained mental health professionals was so grossly inadequate as to amount to no medical and mental health care at all.

134. In light of the above, Jennifer Casey Norred suffered from an objectively and subjectively substantial risk of serious harm while the care given by Defendants Garcia, Sellers, and Robertson was inadequate and unreasonable.

135. More likely than not the deliberate indifference of Defendants Garcia, Sellers and Robertson as alleged above were the cause of Casey Norred's suicide.

136. As a direct and proximate result of the deliberate indifference to Jennifer Casey Norred's serious mental health needs, Jennifer Casey Norred killed herself by hanging herself in her cell on July 24, 2017.

137. Plaintiff is obliged to retain counsel and is entitled to reasonable fees.

WHEREFORE, Plaintiff prays for judgment as noted below.

## IV.    ADA and Rehabilitation Act: Hon. Walter McNeil

138. Plaintiff re-alleges the Common Allegations by reference.

139. This Count is a claim against Defendant McNeil for violating Title II of the

Americans with Disabilities Act, 42 U.S.C. § 12101 et seq., (hereinafter

"ADA") which provides in pertinent part at 42 U.S.C. § 12132:

No qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by such entity.

140. Title II of the Act prohibits, among other things:

- limiting a qualified individual's enjoyment of any right, privilege, advantage, or opportunity enjoyed by others receiving an aid, benefit, or service of an agency; and

- subjecting a qualified individual to discrimination under any program or activity conducted by an agency.

28 C.F.R. § 39.130.

141. Defendant McNeil also violated the Rehabilitation Act of 1973, ⁋ 504 (RA).

142. Casey Norred was disabled as defined at 42 U.S.C. § 12102(2) and a

"qualified individual" as defined at 42 U.S.C. § 12131(2), as she suffered from

hypothyroidism, schizophrenia, bipolar disorder, and depression.

143. Defendant McNeil is a public entity in charge of the Leon County Detention

Center, who receives federal funds and has violated the ADA and RA.

144. Defendant McNeil owed Casey Norred a non-delegable duty to ensure that her

well-being and safety would not be compromised as a result of discrimination

based on her disability. Accordingly, Defendant McNeil is vicariously liable

for the actions of Jail staff and agents designated to care for Casey Norred.

145. Defendant McNeil's agents and employees were authorized to act for

Defendant McNeil and accepted that undertaking when they committed the ADA/RA violations alleged herein. Defendant McNeil had control over his agents and employees when they committed the alleged ADA/RA violations.

146. The ADA/RA violations alleged herein and committed by persons and entities charged with caring for Casey Norred, were done while acting within the course and scope of their employ and/or agency with Defendant McNeil.

147. Casey Norred's need for reasonable accommodations was obvious.

148. Defendant McNeil, and the persons and entities charged with caring for Casey Norred, knew of Casey Norred's need for reasonable accommodations.

149. Defendant McNeil, and the persons and entities charged with caring for Casey Norred, acted intentionally and/or with deliberate indifference to Casey Norred's need for reasonable accommodations as follows:

   a. Inmates at the Leon County Detention Center were entitled to interact with one another, form friendships, sing, play games, visit, chat, and move at liberty within set bounds, subject only to administrative and disciplinary needs. Persons with disabilities like that suffered by Plaintiff's decedent could have enjoyed those benefits except for a lack of treatment and adequate supervision.

   b. Inmates at the Leon County Detention Center were entitled to enjoy physical comforts, like games, books, radios, access to canteen, frequent showers, visits, and phone calls, subject only to administrative and disciplinary needs. Persons with disabilities like that suffered by Plaintiff's decedent could have enjoyed those benefits except for a lack of treatment and adequate supervision.

   c. Inmates at the Leon County Detention Center were entitled to enjoy educational facilities, including a library, writing materials, study aids,

and educational programs, subject only to administrative and disciplinary needs. Persons with disabilities like that suffered by Plaintiff's decedent could have enjoyed those benefits except for a lack of treatment and adequate supervision.

d. Inmates at the Leon County Detention Center were entitled to enjoy religious activities, including chapel, study groups, religious materials, icons and observances, subject only to administrative and disciplinary needs. Persons with disabilities like that suffered by Plaintiff's decedent could have enjoyed those benefits except for a lack of treatment and adequate supervision.

e. Inmates at the Leon County Detention Center were entitled to a safe environment, free of known hazards, with removal of traps and obstructions. Persons with disabilities such as those suffered by Plaintiff's decedent were exposed to a range of hazards, like fixtures that could support a means of hanging, endangering life and safety.

f. Inmates at the Leon County Detention Center were entitled to receive care and treatment that was responsive to their particular health needs, including testing, diagnosis, surgery, therapy, and monitoring. Persons who suffered disabilities such as those suffered by Plaintiff's decedent received only measures designed to keep them restrained and quiet.

g. Inmates at the Leon County Detention Center were entitled to receive security monitoring to protect them from violence at the hands of other inmates and staff. Persons who suffered disabilities such as those suffered by Plaintiff's decedent were known to be subject to violence at their own hand and yet received inadequate security monitoring and inadequate protection.

150. As a direct and proximate result of the refusal and failure of Defendant McNeil and his agents and employees charged with caring for Casey Norred, to provide her with accommodations for her disability, the satisfaction of common needs necessary to a decent life, she suffered the agony of prolonged isolation, loneliness, and despair and was thus driven to suicide.

WHEREFORE, Plaintiff prays for judgment as noted below.

## V. Wrongful Death: Hon. Walter McNeil, as Sheriff

151. Plaintiff re-alleges the Common Allegations by reference.

152. In the alternative, Plaintiff is entitled to relief against Defendant McNeil for negligent treatment of Casey Norred while incarcerated at the Leon County Detention Center resulting in her death in violation of Florida's Wrongful Death Act, §§ 768.16-768.27, Florida Statutes.

### A. Direct Negligence

153. Plaintiff is entitled to relief against Sheriff McNeil for his direct negligence.

154. Defendant McNeil had a non-delegable duty of care for Casey Norred.

155. Defendant McNeil had an obligation to make an appropriate investigation of his agents and employees and failed to do so.

156. Defendant McNeil had an obligation to properly screen, train, supervise, control, discipline, and retain his employees.

157. Defendant McNeil was put on notice of the harmful treatment of inmates through audits, reports, and the media.

158. Defendant McNeil was well aware that inmates, including Jennifer Casey Norred, were not receiving minimally adequate mental health care at Leon County Detention Center. Therefore, it was reasonably foreseeable that harm would befall Jennifer Casey Norred either directly or indirectly as a result of

the actions and omissions of Defendant McNeil.

159. Defendant McNeil was directly liable for Jennifer Casey Norred's death at the Leon County Jail, including but not limited to:

   a. failing to terminate Corizon's contract after its notorious nationwide failure to provide adequate health care to prisoners at other institutions;

   b. short-staffing the jail so that there were inadequate officers to monitor and report on conditions that endangered prisoners;

   c. failing to provide officers with adequate training to respond to jail suicide emergencies to maximize survival;

   d. failing to provide officers with the training necessary to monitor and report psychological crises and relevant facts to mental health clinicians;

   e. failing to ensure timely transport of Ms. Norred to a properly staffed and equipped facility for treatment of a serious mental health condition.

   f. failing to ensure that employees and agents provided inmates at-risk for self-harm with adequate crisis stabilization care;

   g. failing to provide inmates at-risk for self-harm with timely mental health treatment by a licensed Psychiatrist or Psychologist;

   h. failing to ensure that employees and agents provided inmates at-risk for self-harm with regular mental health monitoring and observation;

   i. failing to ensure that employees and agents timely and adequately respond to inmates at-risk for self-harm mental health emergencies;

   j. failing to ensure that employees and agents addressed Casey Norred's feelings of isolation, rejection, unworthiness, fear, lack of exercise, fresh air, friendship, good diet, and physical well-being;

   k. failing to ensure that, in the absence of addressing her needs, failing to at least place Casey Norred under adequate suicidal preventive measures necessary to prevent her death, despite knowledge of the risks to inmates at-risk of self-harm, including, but not limited to, the deteriorative effect on mental illnesses, access to instrumentalities for suicide, and the lack of

persons to watch over the at-risk inmate.

160. Defendant McNeil breached his duty of care proximately resulting in the suffering and death of Jennifer Casey Norred.

**B. Vicarious Liability**

161. Plaintiff is entitled to relief against Defendant McNeil vicariously for the wrongful acts of his employees and agents.

162. At all times material, Defendant McNeil was and is liable for the actions of his employees and agents acting in the course and scope of their employment, as Defendant McNeil could only act through his agents.

163. Defendant McNeil's employees and agents were negligent in the care and custody of Plaintiff's decedent, in:

   a   failing to refer Ms. Norred to mental health when she was clearly identified as "increasingly agitated and irrational";

   b   leaving Ms. Norred in an observation cell with a paper gown and no suicide-safe blanket so she had to roll herself up in her mattress;

   c   failing to have rescue/cut down tools available for use in attempted hangings although hangings are the most common jail suicide method.

   d   Being unprepared to cut the ligature taking precious time away from resuscitation efforts when every second counts.

   e   failed to timely transport decedent to a properly staffed and equipped facility for treatment of a serious mental health condition.

   f   failed to provide a safe environment for an inmate at high risk for suicide, suicide-safe clothing and bedding; exposing decedent to instrumentalities for suicide including an anchor point for hanging;

   g   failing to provide daily intensive mental health treatment by a psychiatrist or psychologist in view of her self-harm attempt history and tendencies;

h   failing to provide Casey Norred with regular mental health treatment despite knowledge of her self-harm attempt history and tendencies;

i   failing to provide Casey Norred with regular mental health monitoring despite knowledge of her self-harm attempt history and tendencies;

j   failing to provide Casey Norred with immediate crisis stabilization care despite knowledge of her need for intensive and structured care;

k   failing to adequately respond to Casey Norred's mental health crises despite knowledge of her self-harm attempt history and tendencies;

l   failing to address Casey Norred's feelings of isolation, rejection, unworthiness, fear, lack of exercise, fresh air, friendship, good diet, and physical well-being;

m   in the absence of addressing her mental health needs, failing to at least place Casey Norred under adequate suicidal preventive measures, despite knowledge of the risks to suicidal inmates, including, but not limited to, the deteriorative effect on mental illnesses, access to instrumentalities for suicide, and the lack of persons to watch over the at-risk inmate.

164. At all times material, to the extent the Hon Walter McNeil's agents and employees were acting in the course and scope of their employment, on behalf of Sheriff McNeil, Sheriff McNeil is vicariously liable.

165. As a direct and proximate result of Defendant McNeil's failure to perform his duty to ensure Jennifer Casey Norred's safety, directly or through his employees and agents, Jennifer Casey Norred suffered and died by suicide.

166. Jennifer Casey Norred's Survivors are as follows:

| SURVIVOR | ADDRESS | RELATIONSHIP |
|---|---|---|
| Elizabeth Meta Frederick | 1590 Lee Avenue, Tallahassee, Florida 32303 | Mother |
| William James Norred | 6220 Veterans Memorial Dr., Tallahassee, FL 32309 | Father |

167. Decedent would have been entitled to maintain this action had death not ensued.

WHEREFORE, Plaintiff prays for judgment as noted below.

## VI.  Claims under § 415.1111, Florida Statutes: McNeil and Petersen

168. Plaintiff re-alleges the Common Allegations by reference.

169. Plaintiff is entitled to relief against Defendant McNeil and Jail Administrator Kimberly Peterson under the Adult Protective Services Act, § 415.1111 Florida Statutes in that decedent met the definition of a "vulnerable adult."

170. Decedent was an adult whose ability to perform normal activities of daily living or to provide for her own care was impaired due to mental illness.

171. Defendant McNeil and Petersen, their agents and employees, in accepting the care and custody of Jennifer Casey Norred assumed the responsibility for a caregiver relationship, involving the regular and frequent care of Jennifer Casey Norred, or the provision of services on a temporary basis.

172. Defendants McNeil and Petersen had a duty to avoid neglect or abuse that caused significant impairment to decedent's physical health.

173. Defendants McNeil and Petersen had a duty of care to decedent to provide care, supervision and services necessary to maintain her health, including medical treatment and therapies, which a prudent person would consider necessary for such a vulnerable adult.

174. Defendants McNeil and Petersen, their agents or employees, breached that duty of care by neglect that could reasonably be expected to cause serious

physical injury or substantial risk of death, and by abusive acts or omissions.

175. Defendants McNeil and Petersen breached their duties owed to decedent as noted in the Wrongful Death Claim and in one or more of the following:

   a. failing to provide suicidal inmates with regular mental health treatment and monitoring by qualified mental health professionals;

   b. failing to provide suicidal inmates with adequate crisis stabilization care;

   c. failing to adequately and timely respond to suicidal inmates' mental health emergencies;

   d. failing to properly screen, supervise and discipline correctional officers and employees involved in the incarceration and care of the decedent;

   e. failing to train correctional officers and medical staff to communicate with each other and with mental health professionals to deal with suicide risk;

   f. failing to house Casey Norred with suicide-safe bedding and clothing and preventing access to suicide instrumentalities like hanging anchor points;

   g. failing to timely transport decedent to a properly staffed and equipped facility for treatment of a serious mental health condition;

   h. failing to address Ms. Norred's feelings of unworthiness, rejection, isolation fear, lack of exercise, fresh air, friendship, and well-being;

   i. Failing to protect Jennifer Casey Norred from abuse and neglect.

176. As a direct and proximate result of Defendant McNeil's breach of duty to the decedent, Plaintiff's decedent suffered injuries as described above.

177. Defendants' acts and omissions as stated above constitute "abuse" as that term is defined in § 415.102(1), Florida Statutes, as well as "neglect" as that term is defined in § 415.102(15), Florida Statutes.

178. Pursuant to § 415.1111, Florida Statutes, Plaintiff is entitled to actual

damages from Defendants, as well as attorneys' fees and costs.

179. Plaintiffs will seek punitive damages as provided for in the statute.

180. Plaintiffs also seek all survival damages permissible under Florida law
including but not limited to pain and suffering and mental distress damages.

WHEREFORE, Plaintiff prays for judgment as noted below.

## Damages

A. The Estate of Jennifer Casey Norred has sustained the following damages:

   1. funeral and burial expenses incurred as a result of decedent's death that
have become a charge against her Estate or that were paid on her behalf;

   2. decedent's conscious pain and suffering as permitted by law;

   3. pre- and post-judgment interest.

B. The Survivors have sustained the following damages:

   1. great mental pain, anguish, and suffering from the date of injury and
continuing for the remainder of her life;

   2. pre- and post-judgment interest; and

   3. medical and funeral expenses due to the death of Casey Norred.

## PRAYER FOR RELIEF

WHEREFORE, the Plaintiffs seek judgment as follows:

A. Compensatory damages against each of the defendants herein;

B. Punitive damages against defendants sued individually;

C.      Damages and fees pursuant to the ADA and Rehabilitation Act;

D.      All damages permitted under Chapter 415, Florida Statutes;

E.      Attorney's fees pursuant to 42 U.S.C. § 1988 and costs of litigation;

F.      A trial by jury on all issues so triable;

G.      Such further relief as the Court deems just and proper.

              Respectfully Submitted,    *s/James V. Cook*_____
                                     JAMES V. COOK, ESQ.
                                     Florida Bar Number 0966843
                                     Law Office of James Cook
                                     314 West Jefferson Street
                                     Tallahassee, Florida 32301
                                     (850) 222-8080; 561-0836 fax
                                     cookjv@gmail.com

                                     ATTORNEY FOR PLAINTIFF

I CERTIFY a true copy hereof was served on 8/20/19 on all attorneys of record registered with the Court's Electronic Filing System. *s/James Cook*