**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF FLORIDA**
**TALLAHASSEE DIVISION**
**CASE NO.: 4:19-cv-00162-MW-MAF**

ELIZABETH FREDERICK, as
Personal Representative of the Estate of
Jennifer Casey Norred and on behalf of
the survivors, Elizabeth Frederick,
Mother and William James Norred,
Father,

       Plaintiff,

v.

WALTER MCNEIL, Sheriff of Leon
County, Florida, CORIZON, LLC, a
Health Services Corporation, MARIA
LILIAN GARCIA, M.D., KIMBERLY
PETERSEN, DEBBIE SELLERS and
MISTY ROBERTSON, in their
individual capacities.

       Defendants.

_____/

**DEFENDANT CORIZON, LLC'S RESPONSE TO PLAINTIFF'S MOTION**
**FOR PARTIAL SUMMARY JUDGMENT AS TO CORIZON LLC'S**
**NATIONAL CORPORATE POLICY OF DELIBERATE INDIFFERENCE**

       Defendant Corizon, LLC ("Corizon") files its Response to the Plaintiff's

Motion for Partial Summary Judgment as to Corizon LLC's National Corporate

Policy of Deliberate Indifference [ECF #85] as follows:

## I.    <u>Background</u>

Jennifer Casey Norred ("Norred") entered the Leon County Jail on April 2, 2017, and an Intake Receiving and Screening was done.  She disclosed daily alcohol and marijuana use.  Her mental health history included schizophrenia, bipolar disorder and medication for depression, but no psychiatric hospital admissions or suicide attempts [ECF #78-1, pp. 1-6].  Corrections officials decided she should be segregated from other inmates because of the nature of her crime [ECF #78-1, pp. 7, 9].  Norred signed a medical consent form [ECF #78-1, p. 11].  She was referred to a mental health counselor because she "used to take psych meds but [stated] they didn't work" [ECF #78-1, pp. 43, 52].

On April 4, 2017, Norred filled out a Health Services Request Form, seeking medications for hypothyroidism and a vegetarian diet.  The medication could not be confirmed because Norred did not provide information as to the prescriber.  On April 13, 2017, a nurse practitioner ordered bloodwork regarding this condition.  She made no other complaints [ECF #78-1, p. 27, 50, 52].

Mental health counselor Robertson examined Norred on April 5, 2017.  Norred declined treatment, stating, "Meds don't work anyway.  I don't see why this is more important than my thyroid medicine.  That's what I need handled, I don't need this."  She was noted to be agitated and irritable, but not suicidal [ECF #78-1, p. 44].

On April 10, 2017, a history and physical was performed by a registered nurse.  Norred disclaimed a history of suicide attempts or current suicidal ideation [ECF #78-1, p. 20, 54-55].

On July 21, 2017, reportedly attempted to hang herself in her cell.  She was examined by Dr. Garcia, who found her to be in no acute distress; found her able to follow instructions; and had no swelling, abrasions or redness on her neck.  Dr. Garcia placed her on direct observation [ECF #78-1, pp. 23-25, 50, 52-53].  However, a jail lieutenant ordered her placed in a restraint chair.  While restrained, Norred was regularly allowed to get out of the chair to stretch, exercise and shower.  Just before her release from the chair, Norred told a registered nurse "I don't want to kill myself".  "I'm OK I just had a disagreement with my Mom and Stepfather."   She was released from the chair the following day, Dr. Garcia approved her release from a medical perspective and Robertson put her on direct observation [ECF #78-1, pp. 45, 50, 53, 59-63].  Logs were maintained by medical staff at regular intervals from 11 a.m. July 22, 2017 until 4 a.m. July 24, 2017 [ECF #78-1, pp. 72-73].

Robertson examined Norred at 7 a.m. on July 24, 2017.  Norred repeated what she told the registered nurse two days previously: "I had gotten bad news from my parents so I was upset but I don't really want to kill myself.  I want my clothes back."  Robertson found her oriented to person, place, time and situation;

her behavior normal; her mood stable; and her thought goal directed, logical and coherent.  Norred denied suicidal ideations.  Robertson released her from suicide watch [ECF #78-1, pp. 45-46, 51].

Norred hung herself about three hours later.  Resuscitation efforts were unsuccessful, and Dr. Garcia declared her dead at 10:24 a.m. [ECF #78-1, p. 58].

While Dr. Garcia, or anyone, can place an inmate on suicide watch in the jail, she has no authority to take them off suicide watch [ECF #78-4, p. 18, ln. 10-16].  In fact, she had no professional authority to treat mental health conditions or the use of the restraint chair [ECF #78-4, pp. 22, ln. 16-25; 23, ln. 1-25; 24, ln. 1-7].

Robertson worked in the jail in various capacities for 14 years, and knew Norred through her many incarcerations.  She explained suicide watch is a very restricted situation in an already severely restricted environment.  The patient is stripped of all belongings, placed naked in a paper gown and observed by corrections officers [ECF #78-2, ¶¶1-3].  While any jail staff can place an inmate on suicide watch, only she or another mental health professional could take them off suicide watch.

Her dealings with Norred were limited, as she refused mental health treatment, which was her right [ECF #78-5, pp. 30, ln. 12-25; 31, ln. 1-17; 38, ln 20-25; 39, ln. 1-25; 40, ln. 2].  This included Robertson's attempts to speak to

Norred while she was in the restraint chair [ECF #78-5, pp. 40, ln. 17-25; 41, ln. 1-7; 42, ln 6-14; 44, ln 11-18]. When Robertson released Norred from suicide watch she did not exhibit or state any intention to harm herself, and Robertson believed her when she gave "rational reasons for her behavior." Based on that belief and employing her professional judgment, she determined Norred could be safely released from suicide watch. Had she thought differently, "there was no obstacle to carrying out that decision. She would have remained on suicide watch" [ECF #78-2, ¶¶4-5; 78-5, p. 54, ln 11-17].

The Medical Defendants retained psychiatrist Alan Abrams, M.D. as their mental health expert. Dr. Abrams reviewed extensive mental health records concerning Norred. It is his opinion that the care provided to her was consistent with both best practices and national standards in correctional facilities and that care was hampered by her refusal to cooperate with mental health professionals. [ECF 78, ¶¶2, 5, 6, 34]. He also opines that Norred did not suffer from a serious mental illness, but only impulse control and unspecified personality disorder with narcissistic and borderline features. She did not meet the criteria for schizophrenia, bipolar disorder or schizoaffective disorder [ECF #78, ¶¶4, 40, 46, 49]. Not everyone that commits suicide suffers from a mental health disorder, as those decisions are behaviors [ECF #78, ¶¶10, 41]. The actions taken by Corizon

employees "were reasonable measures to abate Ms. Norred's risk of self-harm" [ECF #78, ¶33].

Dr. Abrams also explains there is no test to determine suicidality. In reality, it is "a very inexact art." While there are some recognized risk factors, "nearly every detainee or patient will have multiple risk factors," and reliance solely on risk factors results in extraordinary false-positives, so that "for every correct prediction of future suicide attempts, there are nine wrong predictions." "In any particular patient, lacking any current symptoms of severe mental illness, but having some chronic risk factors, it is particularly impossible to predict imminent suicide, unless the patient they are intent on killing themselves in the immediate future or some equally strong expression of a wish to be free from their life's suffering" [ECF #78, ¶¶47, 51].

After reviewing all the records, Dr. Abrams is of the opinion that Norred's suicide "was neither foreseeable nor preventable" unless she was always in either restraints or on suicide watch [ECF #78, ¶48].

## II.   **Argument**

### A.   **Summary Judgment Standard**

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material facts and that the moving party is

entitled to summary judgment as a matter of law."  Fed. R. Civ. P. 56; *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  In 1986, the Supreme Court decided a trio of cases which encourage the use of summary judgment as a means to dispose of cases which are not factually or legally supported.  *See Celotex Corp.*, 477 U.S. at 317; *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986). The primary purpose of granting summary judgment is to avoid unnecessary trials when there is no genuine issue of material fact in dispute, so if the evidence opposing summary judgment is merely colorable or is not significantly probative, summary judgment should be granted.  *See Anderson*, 477 U.S. at 249-50.

The "party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp.*, 477 U.S. at 323. Furthermore, once a moving party identifies those portions of the record showing the absence of a genuine issue of material fact, the party opposing summary judgment must set forth specific facts showing a genuine issue for trial and may not rely on mere allegations or denials.  *See Celotex Corp.*, 477 U.S. at 324; *Anderson*, 477 U.S. at 256-57.  If the record as a whole could not lead a rational

trier of fact to find for the non-moving party, then there is no genuine issue of fact precluding summary judgment.  *See Matsushita*, 475 U.S. at 586.  Where the record facts render the non-moving party's claim implausible, the non-moving party must come up with more persuasive evidence than would otherwise be necessary to defeat summary judgment.  *Id*. at 587.

Evidence that is "merely colorable, or is not significantly probative" of a disputed fact, or a "mere scintilla of evidence" is not sufficient; there must be enough of a showing that the (trier of fact) could reasonably find for that party. *Anderson*, 477 U.S. 242; *Mendoza v. Borden, Inc.*, 195 F.3d 1238, 1244 (11th Cir. 1999); *Walker v. Darby*, 911 F.2d 1573, 1576-1577 (11th Cir. 1990). Conclusory allegations, whether based on speculation or subjective beliefs, are insufficient to oppose a motion for summary judgment.  *Waddell v. Valley Forge Dental Assoc., Inc.*, 276 F.3d 1275, 1279 (11th Cir. 2001); *Holifield v. Reno*, 115 F.3d 1555, 1564 n.6 (11th Cir. 1997) (holding that plaintiff's "conclusory assertions . . . , in the absence of (admissible) supporting evidence, are insufficient to withstand summary judgment"); *Fullman v. Graddick*, 739 F.2d 553, 557 (11th Cir. 1984) ("[M]ere verification of party's own conclusory allegations is not sufficient to oppose summary judgment. . . . ").

## B. Corizon's Constitutional Liability

Because Corizon is a corporation, liability only attaches if an official

unconstitutional policy or custom of the corporation caused the alleged deprivation of constitutional rights. *See Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691 (1978); *Buckner v. Toro*, 116 F.3d 450 (11th Cir. 1997) (extending the application of *Monell* to private corporations performing traditional public functions); *Marsh v. Butler Cnty., Ala.*, 268 F.3d 1014, 1027 (11th Cir. 2001) (*en banc*) (stating that a "[corporation] is liable under section 1983 only for acts for which [the corporation] is actually responsible"), *abrogated in part by Bell Atl. Corp.*, 550 U.S. at 561-63. Therefore, a corporation's liability may not be vicarious. *City of Canton v. Harris*, 489 U.S. 378, 385 (1989); *Monell*, 436 U.S. at 694.

"A policy is a decision that is officially adopted by the [corporation], or created by an official of such rank that he or she could be said to be acting on behalf of the [corporation]. . . . A custom is a practice that is so settled and permanent that it takes on the force of law." *Sewell v. Town of Lake Hamilton*, 117 F.3d 488, 489 (11th Cir. 1997). "To establish a policy or custom, it is generally necessary to show a persistent and widespread practice. Moreover, actual or constructive knowledge of such customs must be attributed to the governing body of the [corporation]." *Depew v. City of St. Mary's*, 787 F.2d 1496, 1499 (11th Cir. 1986). The Supreme Court requires "a plaintiff seeking to impose liability on a [corporation] under §1983 to identify a [corporate] 'policy' or 'custom' that caused the plaintiff's injury." *Bd. of Cnty. Comm'rs of Bryan Cnty., Okla. v. Brown*, 520

U.S. 397, 403 (1997).

However, a plaintiff must do more than merely identify a policy—there must be proof the policy was created with "deliberate indifference to its known or obvious consequences." *Davis v. DeKalb Cnty. Sch. Dist.*, 233 F.3d 1367, 1375-76 (11th Cir. 2000); *see also Monell*, 436 U.S. 658. That is, "liability under §1983 attaches where-and only where-a deliberate choice to follow a course of action is made from among various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in question." *Pembaur v. Cincinnati*, 475 U.S. 469, 483-84 (1986).

The *Brown* Court also narrowed the test for causation when it stated:

> [I]t is not enough for a §1983 plaintiff merely to identify conduct properly attributable to the municipality. The plaintiff must also demonstrate that, through its *deliberate* conduct, the municipality was the "moving force" behind the injury alleged. That is, a plaintiff must show that the municipal action was taken with the requisite degree of culpability and must demonstrate a direct causal link between the municipal action and the deprivation of federal rights.

*Brown*, 520 U.S. at 404 (emphasis in original). A plaintiff's burden is heavy, and the Eleventh Circuit described both the required showing and the reason for heightened showing:

> This high standard of proof is intentionally onerous for plaintiffs; imposing liability on a municipality without proof that a specific policy caused a particular violation would equate to subjecting the municipality to *respondeat superior* liability—a result never intended by section 1983. As the Supreme Court has explained, '[t]o adopt lesser standards of fault and causation would open municipalities to

unprecedented liability under §1983. In virtually every instance where a person has had his or her constitutional rights violated by a city employee, a §1983 plaintiff will be able to point to something the city "could have done" to prevent the unfortunate incident.

*Gold v. City of Miami*, 151 F.3d 1346, 1351 n.10 (11th Cir. 1998); *see also Brown*, 520 U.S. at 415 (stating that "[w]here a court fails to adhere to rigorous requirements of culpability and causation, municipal liability collapses into *respondeat superior* liability").

While a corporation may be liable for deliberate indifference regarding medical care, claims of negligence are never enough to satisfy pleading requirements, as "should haves" are not grist for constitutional litigation.    *Estelle*, 429 U.S. at 106; *Adams v. Poag*, 61 F.3d 1537, 1543 (11th Cir. 1995).

The Eleventh Circuit reviewed the necessary showing in *McDowell v. Brown*, 392 F.3d 1283 (11th Cir. 2004). There, the plaintiff brought section 1983 claims against a Georgia county, claiming policies constituted and resulted in deliberate indifference to his medical needs. Specifically, the plaintiff claimed a policy of understaffing officers to transport inmates to the hospital caused a delay in his transport to the hospital.

In *McDowell*, an inmate was seen and treated for back pain at a local hospital on June 5, 1997. At 9:30 the next night, he reported an inability to urinate and difficulty walking, and medical personnel in the employ of a private medical contractor decided to send him back to the hospital.  But transporting officers

could only take one inmate at a time, and another inmate with trauma was transported first. The next morning, McDowell's transport was bumped several times by mental health inmates, as his condition was not considered an emergency and mental health transports were given priority by policy. Later, McDowell reported no feeling in his legs; was examined by a physician; his condition deemed emergent; and he was taken to the hospital by ambulance. A spinal abscess was diagnosed, and surgery was performed. After surgery, McDowell was an incomplete paraplegic. *See McDowell at 1286-87.*

*McDowell* arrived at the 11th Circuit after the district court granted summary judgment to the county. The court noted the longstanding rule that municipalities cannot be vicariously liable in section 1983 cases, and a plaintiff must show a custom or policy constituted deliberate indifference and a constitutional violation. *Id.* at 1289 (citing *Monell*, 436 U.S. at 692).

"This threshold identification of a custom or policy 'ensures that a municipality is held liable only for those deprivations resulting from the decisions of its duly constituted legislative body or of those officials whose acts may fairly be said to be those of the municipality.' " *McDowell,* 392 F.3d at 1290 (quoting *Bd. of County Com'rs v. Brown*, 520 U.S. 397, 403-04 (1997)). That identification "prevents the imposition of liability based upon an isolated incident." *Id.* "Rather, the incident must result from a demonstrated practice." *Id.* The Eleventh Circuit

concluded that "based on these instructions, McDowell must establish that the county's policy was to understaff the field division, and that this practice left the division unable to execute medical transports." *Id.*

McDowell could not "point to another occasion when the Jail's understaffing, and resulting inability to transport, contributed to or exacerbated an inmate's medical condition." *Id.* Therefore, the court determined this occurrence was an "isolated incident" rather than a "persistent" or "widespread" policy. *Id.* at 1290-91.

Next, the *McDowell* court analyzed whether the "municipality's action was 'taken with the requisite degree of culpability . . . with deliberate indifference to its known or obvious consequences.'" *Id.* at 1291 (citing *Davis ex rel. Doe v. Dekalb County Sch. Dist.*, 233 F.3d 1367, 1375-76 (11th Cir. 2000)). The court found McDowell could not rely on a "generalized policy of understaffing, and a resultant inability to transport." Instead, he had to show the county had a "deliberate intent" to inadequately staff the jail. *Id.*

Relying on the Supreme Court's decision in *Brown*, the *McDowell* court found that in a case "where the plaintiff claims that a municipality's facially valid actions violated his constitutional rights . . . , 'rigorous standards of culpability and causation must be applied to ensure that the municipality is not held liable solely for the actions of its employee.'" *Id.* (quoting *Brown*, 520 U.S. at 405). "Congress

did not intend municipalities to be held liable unless *deliberate* action attributable to the municipality directly caused a deprivation of federal rights." *Brown*, 520 U.S. at 415, 117 S.Ct. 1382 (emphasis in original). For municipal action "to meet this burden, a plaintiff must demonstrate that the lawful action was 'taken with deliberate indifference as to its known or obvious consequences.' " *McDowell*, 392 F.3d at 1291 (quoting *Brown*, 520 U.S. at 407). A "showing of simple or even heightened negligence is not enough." *Id.* (citing *Brown* at 407).

Applying these rules, the Eleventh Circuit found McDowell's argument without merit. The court determined there was no evidence the governing body knew of any potential medical concerns caused by its decision, and found the policy to be sound. *Id.* (stating that the policy to transport inmates or call an ambulance was a "clear, simple directive that said if you cannot transport with your resources you are to call an ambulance for needed medical transportation"). McDowell could not establish "that the Board would anticipate that inmates would not receive timely medical attention." *Id.* at 1292. Thus, the court found the alleged constitutional violation was not a "highly predictable consequence" of the county's failure to budget and staff the jail. *Id.*

The court then considered causation. The county's "deliberate conduct" had to be the "moving force" behind McDowell's injury. *Id.* The court recognized the Supreme Court's caveat in *Brown* that "[t]o prevent municipal liability for a . . .

decision from collapsing into *respondeat superior* liability, a court must carefully test the link between the policymaker's inadequate decision and the particular injury alleged." *Id.* (quoting *Brown*, 520 U.S. at 410). To "test the link" between the injury and the County's conduct, the *McDowell* court looked "to whether a complete review of the budget decision (and the resulting understaffed Jail) reveals that the Board should have known that the injuries were a 'plainly obvious consequence' of that decision." *Id.* (stating that "[w]hile it may be true that the Board's budget decision would make a violation of his constitutional rights 'more likely," that alone cannot 'give rise to an inference that a policymaker's failure to scrutinize the [budget]. . . produced a specific constitutional allegation)(quoting *Brown* at 411). Again, relying on *Brown*, the court went on to state that "liability must be premised on a finding that "*this*" budget decision was 'highly likely to inflict the *particular* injury' McDowell suffered." *Id.* at 1292 (quoting *Brown* at 411) (emphasis in original). The *McDowell* court stated:

> McDowell did not proffer testimony that members of field division believed they could not perform medical transports because of understaffing. Additionally, McDowell did not demonstrate that the County was the moving force behind his injury, given that the Jail was instructed to request an ambulance to transport medical cases to Grady when the field division was unavailable. Finally, the record indicates that the consequences associated with the Jail's failure to transport McDowell to the hospital in a timely fashion never happened before. To hold a municipality liable for any conceivable constitutional violation, whether based on past concrete injury or mere speculation, would erode its ability to manage and govern.

*Id.* at 1292-93.

Plaintiff Elizabeth Frederick ("Frederick") has two methods to prove an unconstitutional policy: (1) an officially promulgated unconstitutional policy, or (2) a widespread unconstitutional and unofficial custom or practice created by a policymaker for Corizon.  She must also allege the policy was created with knowledge that Norred's injuries were a highly probable consequence of the policy's creation.

Frederick fails all-around.  The "Undisputed Facts" section is nothing of the sort.  The opening paragraph has no record citation, as it is wholly made-up [ECF #85 p. 1].  The first paragraph of the first subsection, "Corizon's Deliberate Indifference in This Case," fares no better, as the only citation is to Frederick's mental health expert's report [ECF #85, p. 2].[1]  The citation is to the report generally, not to a specific part of the report, and the report does not contain the opinion asserted.

The failure to provide indisputable facts continues in the "Corizon Contract Performance in Florida" section.  Frederick first describes Corizon's contract with the Florida Department of Corrections and its cancellation, seemingly attributing the cancellation to the FDOC, and citing to an ECF number not in this case [ECF

---

[1] The report is not in affidavit form or otherwise sworn, so it is not admissible at this stage. *Dudley v. City of Monroeville, Ala.*, 446 Fed. App'x 204, 207 (11th Cir. 2011) ("Unsworn statements do not meet the requirements of Rule 56, so the district court could not — and properly did not — rely on the content of the statement."); *Carr v. Tatangelo*, 338 F.3d 1259, 1273 n.26 (11th Cir. 2003)(affirming exclusion of an unsworn expert report.)

#85, pp. 4-5].

Frederick next discusses a review of medical care in the FDOC by an outside company retained by the Florida Legislature [ECF #85, pp. 4-6]. The purpose of the study was to determine which model of patient care was best suited in terms of cost to the Florida Department of Corrections [ECF #84-1, pp. 3-4]. This document is not what Frederick believes it to be and she makes no attempt to show how it is either relevant or material to Norred's time in the Leon County Jail, which is not operated by FDOC. It is also rank hearsay, which is not summary judgment evidence unless it is shown to be admissible at trial, as the "'general rule is that inadmissible hearsay cannot be considered on a motion for summary judgment,'" *Jones v. UPS Ground Freight*, 683 F.3d 1283, 1293 (11th Cir. 2012) (citation omitted), the Court "may consider a hearsay statement in passing on a motion for summary judgment if the statement could be reduced to admissible evidence at trial or reduced to admissible form," *Saunders v. Emory Healthcare, Inc.*, 360 F. App'x 110, 112-13 (11th Cir. 2010) (per curiam) (unpublished) (internal marks omitted) (quoting *Macuba v. Deboer*, 193 F.3d 1316, 1323 (11th Cir. 1999)). Frederick makes no attempt at the required showing.

Frederick's next offer of undisputed facts involves a series of court cases, one from a Florida jail and all others from other states [ECF #85 pp. 6-22]. She asks the Court to take judicial notice of those cases [ECF #85 p. 26]. That, the

Court cannot do.

Federal Rule of Evidence 201 provides, in relevant part:

> The court may judicially notice a fact that is not subject to reasonable dispute because it:
>
> (1)   is generally known within the trial court's territorial jurisdiction; or
>
> (2)   can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned.

Fed. R. Evid. 201(b). "The Eleventh Circuit has explained that a court may take judicial notice of filings in court cases under Rule 201(b)(2) of the Federal Rules of Evidence." *Turner v. AMICO*, CV-15-BE-1202-S, 2015 U.S. Dist. LEXIS 161982, 2015 WL 7770232, at *6 (N.D. Ala. Dec. 3, 2015) (citation omitted) (citing *Cunningham v. Dist. Attorney's Office for Escambia Cty.*, 592 F.3d 1237, 1255 (11th Cir. 2010)). "In addressing whether a court properly takes judicial notice of the nature or substance of court filings and other legal documents, the Eleventh Circuit has distinguished between taking judicial notice of the fact that court records or court filings exist versus taking judicial notice of the truth of matters stated within those court records or court rulings." *Id.* The Eleventh Circuit explained that:

> "[A] court may take judicial notice of a document filed in another court not for the truth of the matters asserted in the other litigation, but rather to establish the fact of such litigation and related filings." Accordingly, a court may take notice of another court's order only for the limited purpose of recognizing the "judicial act" that the order

represents or the subject matter of the litigation.

*Id.* (quoting *United States v. Jones*, 29 F.3d 1549, 1553 (11th Cir. 1994)); *Grayson v. Warden, Comm'r, Ala. Doc*, 869 F.3d 1204, 1225 (11th Cir. 2017) (citation omitted).

The Court can only take notice that certain documents were filed; it cannot notice the content of those documents or consider them for the truth of the content. But that is exactly what Frederick proposes. She is wrong—the documents in those files are not summary judgment evidence. They are hearsay without exception.

Frederick's legal argument is fatally flawed. It includes the wrong standard for cases of this type by arguing the standard for <u>individual liability</u> in prisoner civil rights cases [ECF #85 pp. 25-27]. As a result, there is no identification of an unconstitutional policy, official or unofficial, that was the direct cause of Norred's death. Running with that flawed premise, Frederick concludes Corizon is liable. At best, the argument is inchoate and supporting vicarious liability, a theory not available in cases of this type for nearly 50 years. She may have meant to make the pertinent argument, but she did not, and the Court is not obligated to read her mind or create arguments unmade in the Motion. *Resolution Trust Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir. 1995) ( recognizing that "[t]here is no burden upon the district court to distill every potential argument that could be

made based upon the materials before it . . . .").

## III.   <u>Conclusion</u>

Frederick's burden at this stage is to name the unconstitutional custom or policy, prove it was created with the necessary knowledge and prove it was the direct cause of Norred's suicide.   She fails on all requirements: the custom or policy is not identified; the Motion is unsupported by admissible, relevant or material evidence; and argument applying fact to pertinent law is undone.   It should be denied.


By:   ___/s/ Gregg A. Toomey_____
        Gregg A. Toomey
        Florida Bar No. 159689

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on this 24th day of August, 2020 I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF System, which will send a copy of the foregoing electronically to the following:

James V. Cook
James V. Cook, PA
*Attorneys for Plaintiff*
314 W. Jefferson Street
PO Box 10021 [32302]
Tallahassee, FL 32301-1608
P: 850-222-8080
F: 850-561-0836
E: cookjv@gmail.com

Michael P. Spellman
Matthew J. Carson
Sniffen & Spellman PA
*Attorneys for Defendants McNeil and Petersen*
123 N. Monroe Street
Tallahassee, FL 32301
P: 850-205-1996
F: 850-205-3004
E: mspellman@sniffenlaw.com;
mcarson@sniffenlaw.com
twylie@sniffenlaw.com
mduber@sniffenlaw.com

THE TOOMEY LAW FIRM LLC
*Attorneys for Defendants Corizon, Garcia, Sellers and Robertson*
The Old Robb & Stucky Building
1625 Hendry Street, Suite 203
Fort Myers, FL  33901
Phone:  239.337.1630
Fax:  239-337-0307
Email:  gat@thetoomeylawfirm.com, alr@thetoomeylawfirm.com, and hms@thetoomeylawfirm.com

By:   ___/s/ Gregg A. Toomey_____
        Gregg A. Toomey
        Florida Bar No. 159689