UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION

| | |
|---|---|
| ELIZABETH META FREDERICK,<br><br>　　Plaintiff,<br><br>v.<br><br>MISTY ROBERTSON,<br><br>　　Defendant. | Case No. 4:19-cv-162-MW-MAF |

### PLAINTIFF'S TRIAL BRIEF

Pursuant to the Court's Amended Order for Pretrial Conference (Doc. 129 at 4), Plaintiff Elizabeth Frederick, through her undersigned counsel, files this trial brief to provide authorities and arguments in support of her position on all disputed issues of law pertaining to her remaining Fourteenth Amendment deliberate indifference claim against Defendant Misty Robertson.

## I.　INTRODUCTION AND BACKGROUND

At issue in this trial is whether Defendant Misty Robertson—who, at all times material, was the mental health director for the Leon County Jail through its contract with her employer Corizon—denied Plaintiff's daughter, Casey Norred, her constitutional right to adequate care by deliberately disregarding the immediate and serious threat to her mental health and well-being.

Casey was a young woman with a history of mental illness. She had a significant period of great success managing her mental health conditions and needs with a treatment team. At some point, however, she was taken off her medication, and then while unmedicated and incapable of competently making decisions about her own care, Casey decided that she would not take her medication anymore. Without her medication, Casey suffered mental health episodes and complications, and she ultimately was charged with a crime in Leon County stemming from one of her delusions.

Once detained at the Leon County Jail, Casey continued to refuse medication. That is not to say that she necessarily refused kindness or empathy or consideration. However, she was placed in segregation with violent detainees apparently because something in her history included the word "aggravated," which staff took to mean "violent." (Doc. 79-10, 78-1 at 7, 9). In actuality, that language meant nothing more than "persistent." Certain jail staff tried to promote the idea that Casey should be considered a "special needs" inmate, with its own protections. But that idea was voted down. Per an administrative memorandum from Ericka Walker—Casey's Classification Officer—"According to the Mental Health Professionals, she does not qualify for special needs." (Doc. 91-7). Defendant Robertson testified these discussions were regular for detainees in confinement or who had mental health

issues, but she was not professionally concerned that a mental-health patient like Casey was kept in confinement. (Doc. 79-14 at 57:17–58:25).

Ultimately, Casey was deemed not competent to stand trial for her underlying criminal charge and she was slated for transfer to Florida State Hospital for the purpose of restoring her to competency. Shortly before transfer, Casey attempted to kill herself by hanging. She looped part of her pants through openings in her upper bunk and created a ligature through which she thrust her head, cutting off her air supply. She was discovered by jail staff while she could still be revived. At that point, Defendant Robertson was placed on notice that Casey urgently and objectively needed emergency psychiatric care. However, Robertson did not contact the on-call psychiatrist or seek to move Casey to an inpatient psychiatric program where she could get the care she so badly needed. (*Id.* at 36:6-10). Instead, a jail lieutenant placed Casey in a restraint chair. Although Robertson could have authorized Casey's release that Friday, she decided to leave her in the restraint chair overnight until she would agree to "communicate." (Doc. 91-15 and Video C at 14:02:18). Casey was in the restraint chair for 24 hours.

The next day, Casey was placed in direct observation. Apparently, two jail logs are maintained for persons in direct observation—a medical log and an inmate event log. The medical log includes details like "sleeping" or "stretching" or "yelling" but nothing substantive, like, for instance, what Casey was yelling about—

3

instead, those notes are memorialized only on the inmate event log. Early on the second day, while in direct observation, the inmate event log indicated that Casey was asking to see a doctor and then later, asking jail staff to kill her: "shoot me in the head," "I'm a fucking ant." (Doc. 79-10 at 1).

Despite containing the substance of Casey's communications, which clearly had relevance to modes of treatment, Robertson did not review the inmate event log. Instead, she briefly spoke to Casey (no more than 10 minutes) and accepted a cursory statement from her that the reason she tried to kill herself was that she had just received some bad news. Robertson did not take the opportunity to find out more—to ask what the bad news was and whether it had been resolved. No, after failing to review the logs and performing a perfunctory interview with Casey, Robertson handed Casey her clothing—the same kind of clothing she had just used to try to hang herself—and sent her back to her cell—the same cell that where she was able to use the bunk bed to hang herself. She sent her there without any special precautions and no requirement that she be checked on frequently.

Within 35 minutes of being taken back to her cell, on her release from observation by Robertson, Casey was found hanging from a ligature she had tied using her pants. (Doc. 79-11 at 2). Because there was no suicide plan, jail staff did not know what to do when they found her. (*Id.*). For a substantial period, someone

4

tried to hold her up in a bear hug while someone else fumbled with the knot. (*Id.*). Casey did not survive her second suicide attempt.

## II. DISPUTED ISSUES OF LAW

The sole disputed issue of law for trial is whether Robertson's conduct constitutes deliberate indifference to Casey's Fourteenth Amendment right to timely and adequate mental health care as a pretrial detainee at the Leon County Jail. *Mann v. Taser Int'l, Inc.*, 588 F.3d 1291, 1306 (11th Cir. 2009) (explaining that a pre-trial detainee's "rights exist under the due process clause of the Fourteenth Amendment" but "are subject to the same scrutiny as if they had been brought as deliberate indifference claims under the Eighth Amendment"); *Goebert v. Lee Cnty.*, 510 F.3d 1312, 1326 (11th Cir. 2007). That right includes the right to be free from self-inflicted injuries, including suicide. *See Cook ex Rel. Tessier v. Sheriff Monroe Cnty*, 402 F.3d 1092, 1115 (11th Cir. 2005).

Plaintiff, as the personal representative of Casey's estate and on behalf of her statutory survivors, sued Robertson under section 1983 for her deliberate indifference to Casey's known risk of suicide under the Fourteenth Amendment. To establish liability for a detainee's suicide under section 1983, the "plaintiff must prove that the official had subjective knowledge of a risk of serious harm and disregarded that risk by conduct that constituted more than mere negligence." *Gish v. Thomas*, 516 F.3d 952, 954 (11th Cir. 2008) (citation omitted). The law requires

5

that the defendant "deliberately disregard[ed] a strong likelihood rather than a mere possibility that the self-infliction of harm will occur." *Cook*, 402 F.3d at 1115 (emphasis deleted). The defendant must also be subjectively aware that "the combination of the [detainee's] suicidal tendencies and the feasibility of suicide in the context of the [detainee's] surroundings [will] create[] a strong likelihood that the [detainee] will commit suicide." *Gish*, 516 F.3d at 954–55 (emphasis deleted). The mere "opportunity" to commit suicide is not enough. *Tittle v. Jefferson County Comm'n*, 10 F.3d 1535, 1539 (11th Cir. 1994) (en banc).

> **A. Robertson had actual subjective knowledge of Casey's risk of serious harm.**

In assessing the first prong of the deliberate indifference test, the question is whether Robertson had a "personal, subjective knowledge of a suicide risk." *Jackson v. West*, 787 F.3d 1345, 1356–57 n.6 (11th Cir. 2015). Robertson clearly had such subjective knowledge because Casey was in her care immediately following a suicide attempt and had knowledge of previous suicidal tendencies and Casey's mental health history. *Cf. Cagle v. Southerland*, 334 F.3d 980, 989 (11th Cir. 2003) (quoting *Popham v. City of Talladega*, 908 F.2d 1561, 1564 (11th Cir. 1990) ("Absent knowledge of a detainee's suicidal tendencies . . . [the] failure to prevent suicide has never been held to constitute deliberate indifference."); *see also* (Doc. 95-1 at 7-8 (Corizon's Suicide Prevention Manual)) (noting that prior risk of suicide was a strong indicator of future risk).

### B. Robertson disregarded that risk by conduct that is more than negligence.

As for the second and third prongs (disregard of substantial risk; conduct more than negligence), Robertson's acts and omissions concerning Casey's strong likelihood of committing suicide constitute deliberate indifference for the following reasons.

### 1. Robertson failed to properly initiate mental health treatment.

Defendant Robertson was the mental health director at the Leon County Jail, but she was not a psychiatrist, and she had no license or ability to prescribe medication. (Doc. 79-14 at 36:6-10). When Casey presented after an unsuccessful suicide and with a history of mental illness, Robertson chose not to call the on-call psychiatrist to evaluate her. No, with minimal training and a high workload, Robertson took it upon herself to play physician at the cost of Casey's life. (Doc. 91-8 at 19, 24). Her idea of care was permitting Casey to suffer in restraints for 24 hours—calling it both a "security tool" and "mental health treatment . . . if someone is actively trying to harm themselves and you cannot get them to de-escalate their behaviors by any least-restrictive measure." (Doc. 79-14 at 46–47). Rather than seeking immediate medical attention, from afar (as Robertson was not initially present at the jail) she decided to leave Casey in the restraint chair overnight until she would agree to "communicate"—effectively punishing her rather than attempting intervention. (Doc. 91-15 and Video C at 14:02:18). By taking matters

7

into her own hands and not permitting Casey to see a psychiatrist—including upon her release from direct observation (*see* Doc. 91-8 at 19)—Robertson grossly disregarded Casey's substantial risk of suicide. *See Dolihite v. Maughon*, 74 F.3d 1027 (11th Cir. 1996); (*see also* Doc. 112 at 24) (analogizing the facts of this case to *Dolihite*, where the provider removed a juvenile from observation without contacting the on-call psychiatrist).

### 2. Robertson was deliberately indifferent in determining Casey could return to her cell.

Robertson disregarded Casey's strong likelihood of suicide risk in connection with her release from direct observation. She failed to review the inmate logs,[1] deviated from Corizon policy by relying on Casey's "self-report," took fewer than 10 minutes to interview Casey, and let her return to her cell with clothing that could be used in a subsequent suicide attempt.

As noted above, there were two logs used by jail staff once Casey was removed from restraints and placed in direct observation. One log included surface-level information—date, time, appearance, state (resting, sleeping, yelling, screaming, etc.); the other log included communications from Casey. That log—the

---

[1] As she pointed out in her Motion for Summary Judgment, Robertson "worked in the jail in various capacities for 14 years," (Doc. 83 at 4) and would have known of the Inmate Event Logs, but she neither reviewed those logs nor required the medical logs to document Casey's actual statements rather than simply that she was "yelling and screaming," or sleeping or in some other general state.

inmate event log—captured some of Casey's final words revealing her then-existing mental state. Like "shoot me in the head," "I'm a fucking ant." (Doc. 79-10 at 1). But Robertson did not review the inmate event log or inquire with any staff concerning its substance.

Instead, Robertson relied solely on a brief final encounter with Casey, lasting a mere few minutes and relying primarily on Casey's "self-report" of her mental state and suicidal ideations. "Self-reports" are unreliable. (Doc. 91-8 at 18). And they violate Corizon's Suicide Prevention Manual, which cautions providers not to rely exclusively on patient direct statements. (Doc. 95-1 at 151). The Corizon Suicide Prevention Manual also states that "[a]ssessment includes a longitudinal review of the risk factors, not only relying on what the inmate says." (*Id.* at 123).

Upon concluding that brief encounter, in which Robertson relied primarily upon Casey's direct statement, Robertson permitted Casey to return to her cell with the same clothes she used to try to kill herself days earlier. When Robertson completed the brief encounter, however, she noted in a mental health risk assessment tool that there were no concerning observations. But she also wrote that Casey was "not stable." (Doc. 91-4, LCJ Medical Records at 6). It is possible that the jury could infer based on these observations that Robertson realized she was providing grossly inadequate care when releasing Casey after finding her "not stable." *Campbell v. Sikes*, 169 F.3d 1353, 1365 (11th Cir. 1999).

9

Robertson's gross conduct and disregard for Casey's actual and foreseeable risk of suicide is analogous to *Steele v. Shah*, 87 F.3d 1266 (11th Cir. 1996) and *Greason v. Kemp*, 891 F.2d 829, 835 (11th Cir. 1990). In those cases, the Eleventh Circuit concluded that there was sufficient circumstantial (and direct, though not necessary) evidence without any expert testimony to establish subjective mental intent for the purposes of proving grossly inadequate care regarding a known risk of suicide. In *Steele*, the doctor stopped his medication in prison after a "less than one minute" meeting and without reviewing Steele's medical records. In *Greason*, the treating doctor saw him for a few minutes, promptly concluded that Greason's condition had stabilized, and discontinued Greason's medications without reviewing the clinical file or assessing Greason's mental status to determine his potential for suicide. The letters in the clinical file showed Greason was a schizophrenic, had suicidal tendencies, and needed medication.

Again, here, Robertson only showed up to see Casey for a brief encounter, at the end of which she decided to release her—with the very tools and conditions in which she made her first attempt—without contacting the doctor and without fully reviewing the medical records and logs to determine Casey's true state of mind. The same year Casey killed herself, Robertson was praised by Corizon in performance review for her ability to "maintain a large quantity of work load [sic]." Robertson had too many other matters to focus on Casey and prevent her suicide. The evidence

will show and a jury will likely find that she was deliberately indifferent in these respects.

### 3. Robertson's failure to ensure a meaningful suicide plan or adequate post-release observation constituted gross conduct.

Robertson's failure to institute a suicide plan, hanging rescue plan or similar process, or step-down program upon Casey's release from direct observation constituted deliberate indifference. The National Commission on Correctional Health Care (NCCHC) suicide prevention program, MH-G-04, provides that acutely suicidal inmates are to be placed on constant observation. (Doc. 91-11 at 2, NCCHC, Standard MH-G-04 at 2). Non-acutely suicidal inmates[2] are required to be monitored on an unpredictable schedule with no more than fifteen minutes between checks. Robertson did not provide any plan for Casey's release, let alone one that complied with the NCCHC guidelines. Without a plan, step-down process, or frequent checks, within approximately 30 or 40 minutes of being returned to her cell, Casey killed herself. Robertson's failure to take any steps to mitigate the risk of foreseeable suicide upon release from observation constitutes deliberate indifference. *See, e.g.,*

---

[2] The NCCHC suicide prevention program describes non-acutely suicidal inmates as: "[T]hose who express current suicidal ideation…and/or have a recent prior history of self-destructive behavior. In addition, inmates who deny suicidal ideation or do not threaten suicide but demonstrate other concerning behavior (through actions, current circumstances, or recent history) including the potential for self-injury should be placed on suicide precautions and observed at staggered intervals not to exceed every 15 minutes (e.g., 5, 10, 7 minutes)." (*Id.* at 3).

11

*Allen v. Freeman*, CV 110-022, 2013 WL 3356040 (S.D. Ga. July 2, 2013) (citing *Mombourquette ex Rel. Mombourquette v. Amundson*, 469 F. Supp. 2d 624 (W.D. Wis. 2007) (for the proposition that failing to place a prisoner on suicide watch or ordering frequent cell checks after suicide attempt was deliberate indifference).

### III. CONCLUSION

For the foregoing reasons, and for the reasons alleged in the operative complaint, Plaintiff is entitled to judgment against Defendant Misty Robertson to the full measure of damages sought in her complaint.

Further, given that Robertson discharged this claim in bankruptcy precluding *in personam* recovery against her, Plaintiff will also promptly move to include Corizon[3] and its insurers on the final judgment against Robertson.

Dated: September 9, 2022.

                Respectfully Submitted,  *s/ James V. Cook*
                                              JAMES V. COOK, ESQ.
                                              Florida Bar Number 0966853
                                              Law Office of James Cook
                                              314 West Jefferson Street
                                              Tallahassee, Florida 32301
                                              (850) 222-8080; (850) 561-0836 Facsimile
                                              cookjv@gmail.com

---

[3] As will be briefed, the underlying Lone Star policy names Robertson as an insured. Pursuant to an endorsement, Robertson is not required to pay out any damages under the non-physician self-retention. Instead, Valitas, as the first named insured, assumed that obligation. Corizon, however, separately agreed with Lone Star to administer and pay all claims of damages—including for claims made against Robertson for which Valitas would be liable—until Corizon reaches a self-insurance retention aggregate amount, after exhausting which Lone Star would remain liable for damages in this case.

-and-

*s/ James M. Slater*
JAMES M. SLATER, ESQ.
Florida Bar Number 111779
Slater Legal PLLC
113 S. Monroe Street
Tallahassee, Florida 32301
james@slater.legal
Tel. (305) 523-9023

*Attorneys for Plaintiff*

## Certificate of Service

I hereby certify that on September 9, 2022, I electronically filed the foregoing document with the Clerk by using the CM/ECF system, which will serve a copy on all counsel of record.

By: *s/ James V. Cook*
    James V. Cook

13